Filed 12/3/14  P. v. Moreno CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C072902 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F06494) |
| v. | |
| JOSE MORENO, | |
| Defendant and Appellant. | |

In this case of extreme stalking, defendant Jose Moreno burglarized his ex-girlfriend's home 11 times, installed spyware on her computer, intercepted her e-mail and Internet chats, and stole numerous items, including some of great sentimental value.  He covertly installed cameras in her home, spied on her and her new boyfriend, and secretly photographed her while she was inside her bathroom, among other locations.  Convicted of 19 felonies and two misdemeanors, defendant was sentenced to 19 years four months

in prison and required to register as a sex offender under Penal Code section 290.006.[1] On appeal, he contends there was insufficient evidence of two counts of wiretapping (counts 14 and 15) and that he was entitled to a jury trial under *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] *(Apprendi)* on the facts supporting discretionary sex offender registration because its residency requirements impose additional punishment. We find no prejudicial error and affirm.

**FACTS**

Tomasa Duenas met defendant through the social network My Space. They became a couple in April 2007; she lived in Sacramento and defendant was in Berkeley. In May 2009, defendant moved to New York to complete a master's degree at Columbia University. Duenas broke up with defendant in January 2010 because she could not see the relationship going anywhere.[2] They stayed in touch and had a cordial relationship.

Around February or March, she decided to give defendant another chance. He came to visit her at her residence in March. During that visit, without her knowledge, he installed two spyware programs on her computer. The first, Spector Pro, recorded computer activity such as e-mail, chats, instant messaging, and websites visited. The second, eBlaster, e-mailed the records of the computer activity to a designated address. The activity reports were e-mailed to defendant.

In April, defendant insisted on coming out to help Duenas move. He gave her a gift, a wireless Internet router. He set it up, providing the router name, East Oakland, and the password. Duenas had Internet service through Comcast; the wireless router connected to the modem by cable.

---

[1] Further undesignated statutory references are to the Penal Code.

[2] All further dates are to 2010 unless otherwise specified.

Defendant graduated in May and returned to Sacramento. He stayed with Duenas a few days a week; the rest of the time he stayed with his family in Watsonville. On July 16, they argued and broke up.

On July 23, Duenas noticed her tickets to a concert were missing from her apartment, and thought that defendant had taken them. She sent him a text message, asking if he had a way to get in her apartment. She replaced the tickets and went to the concert. Defendant also was at the concert, and texted her with a specific dedication before a particular song. The police later found a photograph of Duenas's calendar, taken July 23, in defendant's possession.

A few days later, Duenas returned home from work early and found defendant in her bedroom. She asked him to leave and he did. On July 31, Duenas met Victor Garcia. The next day Garcia gave her a note and a music CD. She put the note in a shoe box with other keepsakes, but later noticed the note was missing.

On approximately August 1, Duenas went to defendant's new apartment and made dinner for him. She spent the night and they were intimate. The next day, defendant went to Duenas's and tried to initiate sex. She said no and told him that the night before had been a mistake. Defendant persisted and Duenas gave in. On August 3, Duenas came home and found defendant by her bed. At first, he refused to leave, saying he wanted to talk, but he eventually left. She found his water bottle in the closet and texted him, asking how long he had been in her closet. He asked if he could come get the bottle. Although she said no, defendant showed up and pushed his way into her apartment. Defendant followed her into the bedroom and kept saying "get naked" in Spanish. He tried to pull her shorts down. She began to cry and defendant kept pulling at her shorts until he got them off. In a demanding tone, he told her to "show me how you're going to give it to Victor." She kept telling him to leave and defendant responded that if she forced him to leave he would publish nude pictures he had of her. She said she would sue him and he replied he had nothing to lose. Duenas spent 30 minutes in the bathroom

3

crying. Defendant tried to bargain with her; if she would attend counseling to work on her "issues," he would leave her alone. Eventually defendant began a "rant" about how he was sorry and his jealousy was due to his insecurities. He finally left after she told him he had lost her forever.

Duenas had her apartment manager change her apartment's locks. She found the eBlaster software on her computer and had an Apple computer technician remove it. She also changed the password on her computer. On August 6, at the urging of friends, Duenas reported defendant to the police, but did not ask to have charges filed.

The stalking continued. On August 24, Duenas could not log in to her computer because of password difficulties and discovered the eBlaster software was back on her computer. She also noticed that her stuffed animals were rearranged and a box of mementos was missing. Also missing were a letter requesting to be let out of her lease and the police report she had filed. A photograph of a wedding invitation on her refrigerator, taken that day, was later found in defendant's possession. On August 27, Duenas found two cameras, one hidden under her stuffed animals and the other under the dresser. These cameras had recorded video with sound. Duenas contacted the police, who suggested she call defendant and ask him about the cameras. He said that was "a loaded question," but did not deny he put them in her apartment.

Duenas went to stay with a friend. Defendant took numerous photographs of Duenas while she was in the bathroom at her friend's -- apparently from immediately outside the apartment looking in. The friend heard noises at night and asked Duenas to leave due to concerns about safety. Duenas first relocated to a house in Folsom and then to a house on Castro Way that had an alarm system. She did not tell her friends where she was living. She obtained a restraining order against defendant.

On September 26, Garcia visited her and spent the night. They were intimate on several occasions that night and disposed of used condoms in the bathroom trash.

4

Duenas had waxed her bikini line before his visit. The used wax strips and condoms were later found in a plastic bag during a search of defendant's residence.

Duenas began having problems with the alarm; she could not set it. She contacted the alarm company; the technician told her the alarm had been tampered with and the sensors had been removed.

On October 2, Duenas went out with Garcia to celebrate his birthday. While she was out, the alarm was triggered and the police responded and asked Duenas to come home. Duenas and Garcia returned to the house and Duenas gave the police a key. A canine unit entered the house and defendant came out of the house and was arrested. Defendant told Garcia "happy birthday" in Spanish.

Two searches of defendant's residence, including his computer, revealed a wealth of evidence. Defendant had a computer file that he had labeled "stalking." Inside were photographs of items in Duenas's apartment establishing on what dates defendant had entered the apartment. Defendant had e-mailed himself detailing Duenas's sexual activities with Garcia and indicating that defendant had telephoned her residence once while she and Garcia were having sex and had (somehow) observed their activity in response to his call. The police found jewelry and other items taken from Duenas's apartment, as well as a lock-picking kit. Defendant had accessed the hidden cameras and received videos from them over the Internet more than 40 times. There were numerous intercepted e-mails and chats. Defendant had monitored and documented Duenas's menstrual cycle. In one document, defendant had written, "I'm proud/pleased that she is so scared for her safety that she avoids being home especially by herself."

Defendant admitted he installed the spyware and cameras, photographed Duenas, broke into her apartment on several occasions, and took some items. His defense was that he never wanted to scare her; he just wanted to "[k]eep her company without her knowing it."

5

## DISCUSSION

### I

*Sufficiency of Evidence of Wiretapping*

Defendant was convicted of three counts of wiretapping (§ 631, subd. (a)). The first count related to the installation of the eBlaster software in March. The second two, counts 14 and 15, related to the cameras installed in late August. Defendant contends there is insufficient evidence to sustain the convictions on counts 14 and 15 because he did not intercept a communication sent over a wire. He concedes his conduct may have violated the eavesdropping statute -- section 632 or section 647, subdivision (j) -- which proscribes secretly videotaping someone in certain circumstances. He contends, however, that we cannot modify the judgment to reflect violations of these statutes because they are lesser related, not lesser included, offenses.

"Subdivision (a) of section 631 prescribes criminal penalties for three distinct and mutually independent patterns of conduct: intentional wiretapping, willfully attempting to learn the contents or meaning of a communication in transit over a wire, and attempting to use or communicate information obtained as a result of engaging in either of the previous two activities." (*Tavernetti v. Superior Court* (1978) 22 Cal.3d 187, 192.) "In enacting this statute, the Legislature declared in broad terms its intent 'to protect the right of privacy of the people of this state' from what it perceived as 'a serious threat to the free exercise of personal liberties [that] cannot be tolerated in a free and civilized society.' (Pen. Code, § 630.) This philosophy appears to lie at the heart of virtually all the decisions construing the Privacy Act. [Citation.]" (*Ribas v. Clark* (1985) 38 Cal.3d 355, 359 (*Ribas*).)

At issue here is the second pattern of conduct -- willfully attempting to learn the contents or meaning of a communication in transit over a wire. Section 631, subdivision (a) punishes anyone "who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the

6

contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state."

We recognize that in the usual wiretapping case, the private communication is being transmitted by one of the parties to the communication. Such was the case in the wiretapping count involving the eBlaster software where defendant intercepted Duenas's e-mail and chats. Here it was defendant who transmitted the pictures taken by the cameras that he secretly installed. But the statute, quoted *ante*, does not require that the victim actually transmit, only that the defendant *intercept* the communication "without the consent of all parties" *or* "in any unauthorized manner." (§ 631, subd. (a).) We acknowledge "the broad wording and purpose of the statute." (*Ribas, supra*, 38 Cal.3d at p. 360.)

Richard Guilleland, a computer expert and reserve police officer, testified about the operation of the cameras defendant installed in Duenas's apartment. Defendant bought two Sharx cameras, web-based security cameras, designed to be accessed through the Internet by a router. Duenas's wireless router was able to accommodate multiple devices including cameras. A port would be designated for each camera. Guilleland opined the setup for the East Oakland router at ports 8150 and 8151 was consistent with the setup for similar Sharx cameras. The camera would have to be set up within 100 feet of the router. Defendant's laptop computer had a bookmark named "net cam" with an IP address identical to that of the first camera.

Defendant had contacted Sharx customer service for help in setting up the cameras. Sharx suggested using port 8150 and port 8151 on the IP address for the East Oakland router (Duenas's wireless router) to access the cameras remotely. Defendant told Sharx he was able to access the cameras.

Defendant's laptop had software for monitoring cameras; several cameras could be viewed at once. Among his "favorite" links were to "bed cam" and "floor cam" which

were linked to ports 8150 and 8151. These sites were accessed multiple times August 24 through August 30. Each camera had a memory card that contained video files. A series of these videos was played to the jury.

Duenas had Internet service through Comcast. Her computer was connected wirelessly to the router, which in turn was connected by a cable to the Comcast service provider box. Thus, anything transmitted by Duenas's router over the Internet was transmitted over a "wire, line or cable." Defendant made unauthorized use of Duenas's router to learn the contents of the communications he unlawfully captured using the hidden cameras. The cameras captured both words and real time images, thus they captured "communications," as defendant conceded at oral argument. (See *People v. Drennan* (2000) 84 Cal.App.4th 1349, 1356 [eavesdropping statute (§ 632) addresses the interception and recording of sound-based or symbol-based communications, not still, timed photographs without sound]; *People v. Gibbons* (1989) 215 Cal.App.3d 1204, 1209 [communication under eavesdropping statute covers communication by conduct].)

In his reply brief, defendant contends that when he used the router, the camera had already recorded and stored the images and sounds on a memory card.[3] He contends the wiretapping statute does not apply to stored communication or stored content, citing to section 629.51, subdivision (b). That provision states: "This chapter applies to the interceptions of wire and electronic communications. It does not apply to stored communications or stored content." This provision, however, does not apply to the wiretapping statute. The chapter referred to is Chapter 1.4, Interception of Wire, Electronic Digital Pager, or Electronic Cellular Telephone Communications. (§§ 629.50-629.96.) The wiretapping statute, section 631, is in Chapter 1.5, Invasion of Privacy. (§§ 630-638.)

---

[3] At oral argument, defendant abandoned this argument, arguing instead that there was no "interception" regardless of whether the camera images were live or stored.

Defendant's installing of hidden cameras, surreptitiously recording Duenas's conversations and activity, transmitting those recordings over the Internet through the unauthorized use of Duenas's router, and viewing those videos on his own computer encompassed more illegal acts than simply wiretapping. But his unauthorized transmission and viewing of those videos constituted wiretapping. There was substantial evidence to support his convictions for wiretapping in counts 14 and 15.

## II

### *Right to Jury Trial on Facts Supporting Registration*

At the request of both the People and Duenas, the trial court ordered defendant to register as a sex offender under the discretionary provisions of section 290.006. The court made extensive findings that defendant committed his offenses due to a sexual compulsion towards the victim.

Defendant contends that since sex offender registration now includes severe residency restrictions, it increases the maximum sentence within the meaning of *Apprendi, supra,* 530 U.S. 466 [147 L.Ed.2d 435] and a jury trial is required on the facts used to support the order.

A. *The Law*

Section 290 requires persons convicted of certain acts to register as sex offenders. Under section 290.006, the court may order other persons to register as sex offenders "if the court finds at the time of conviction or sentencing that the person committed the offenses as a result of sexual compulsion or for purposes of sexual gratification." The court must state its findings and reasoning on the record. (*Ibid*.) As our Supreme Court has explained regarding application of the predecessor statute to section 290.006 (former section 290, subdivision (a)(2)(E)), "the trial court must engage in a two-step process: (1) it must find whether the offense was committed as a result of sexual compulsion or for purposes of sexual gratification, and state the reasons for these findings; and (2) it must state the reasons for requiring lifetime registration as a sex offender. By requiring a

separate statement of reasons for requiring registration even if the trial court finds the offense was committed as a result of sexual compulsion or for purposes of sexual gratification, the statute gives the trial court discretion to weigh the reasons for and against registration in each particular case." (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1197 (*Hofsheier*).)

The statute does not define "sexual compulsion." In *Hofsheier,* our Supreme Court stated a court "may require lifetime registration if it finds the crime to have a sexual purpose." (*Hofsheier*, *supra*, 37 Cal.4th at p. 1198.)

In 2006, the voters enacted Proposition 86, known as Jessica's Law, which provided in part: "Notwithstanding any other provision of law, it is unlawful for any person for whom [sex offender] registration is required pursuant to Section 290 to reside within 2000 feet of any public or private school, or park where children regularly gather." (§ 3003.5, subd. (b).)

The issue of whether the discretionary imposition of lifetime sex offender registration, which includes the residency restrictions of Jessica's Law, increases the "penalty" for the offense within the meaning of *Apprendi*, and requires that the facts supporting the trial court's imposition of the registration requirement be found true by a jury beyond a reasonable doubt is currently pending before the California Supreme Court. (*People v. Mosley* (2010) 188 Cal.App.4th 1090, review granted Jan. 26, 2011, S187965 [residency restriction is punitive and subject to *Apprendi* rule]; accord, *In re J.L.* (2010) 190 Cal.App.4th 1394, review granted Mar. 2, 2011, S189721; *In re S.W*., review granted Jan. 26, 2011, S187897 [residency restriction is not punitive and hence not subject to *Apprendi* rule].) While we await guidance from our high court, we will assume for purposes of argument that discretionary sex offender registration is subject to *Apprendi*. Accordingly, the question before us is whether the court's failure to submit the factual issue to a jury was prejudicial.

10

*Apprendi* error is not reversible per se, but is reviewed under the harmless error standard set forth in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705]. (*People v. Sandoval* (2007) 41 Cal.4th 825, 838.)  The test for prejudicial error is whether we are convinced beyond a reasonable doubt a jury would have made the factual finding necessary for the court to impose the sex offender registration requirement on defendant under section 290.006.  (*Sandoval*, at pp. 838-839.)

B.  *Analysis*

Defendant contends a reasonable juror could find his offenses arose from his distress over his breakup with Duenas, rather than from a sexual compulsion.  We disagree.  While defendant may have been distressed over the breakup, many of his actions had a definite sexual content, indisputably showing his crimes had "a sexual purpose."  (*Hofsheier, supra,* 37 Cal.4th at p. 1198.)

The Legislature has recognized that stalking is often for sexual gratification or due to sexual compulsion.  The stalking statute provides:  "In addition to the penalties provided in this section, the sentencing court may order a person convicted of a felony under this section to register as a sex offender pursuant to Section 290.006."  (§ 646.9, subd. (d).)  Defendant was convicted of stalking under section 646.9, subdivision (a) for the period August 3 to September 13, and stalking under section 646.9, subdivision (b) for the period September 13 to October 2, after the temporary restraining order was issued.

Defendant was motivated by sexual jealousy.  He admitted he installed spyware on Duenas's computer because he was concerned that she was texting other men.  He was jealous when she danced with others.  He admitted to Duenas that he was jealous.  He called her while he was watching her engaged in sexual relations with Garcia, and then watched their reaction to the call and subsequent sexual activity and e-mailed himself a detailed description of these events.

11

His jealousy, however, grew into sexual obsession and perversion; when he acted on it, it became sexual compulsion. He monitored Duenas's sexual activity, noting once that she was "quite horny all week" and had wet stained panties as she read a sexually-themed magazine. He recorded in detail the actions and words of Duenas's sexual encounters with Garcia. He monitored her menstrual cycle and documented when she missed taking a birth control pill and bled as a result, even noting the type of feminine hygiene product she used. He installed cameras in her apartment "to get a better feel for her interactions with [Garcia]." After she moved, he prowled outside her friend's apartment and took numerous pictures of Duenas nude, in the shower, and on the toilet so he could "feel close to her." He not only took items of her intimate apparel from her residence, but also took used condoms and wax strips, which he labeled and kept in his home. He claimed only that he found them "interesting."

On August 3, defendant's actions were overtly sexual. He barged into Duenas's apartment after she had found him there and made him leave. He followed her as she tried to get away, pulling on her shorts and telling her to "get naked." Once he got her shorts off, he grabbed at the other pair she tried to put on. He demanded that she "show me how you're going to give it to [Garcia]." As she backed up and told him to leave, defendant threatened to publish nude photographs of her if she made him leave.

The evidence is overwhelming that defendant's crimes were due to sexual compulsion. Any error in failing to submit the question to the jury was harmless beyond a reasonable doubt. Because we find no prejudicial error in not submitting the registration issue to the jury, we need not address defendant's alternative claim of ineffective assistance of counsel for failure to raise the *Apprendi* issue at trial.

## III

### *Crime Prevention Fine*

The trial court imposed a crime prevention fine under section 1202.5 of $110, calculated as $10 times the 11 burglary counts. Defendant contends this was an

unauthorized sentence because section 1202.5 permits only a single $10 fine in a single case. (*People v. Crittle* (2007) 154 Cal.App.4th 368, 371.) The People properly concede the error.

## DISPOSITION

The judgment is modified by reducing the crime prevention fine (§ 1202.5, subd. (a)) to $10. As modified, the judgment is affirmed. The trial court is directed to amend the abstract of judgment accordingly and to send a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.


      DUARTE     , J.


We concur:


    RAYE     , P. J.


    BUTZ     , J.